```
                 UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
                       TAMPA DIVISION


UNITED STATES OF AMERICA,      ) Tampa, Florida
                               )
               Plaintiff,      ) No. 8:11-cr-48-T-33AAS
                               )
          vs.                  ) July 8, 2015
                               )
JUAN ALBERTO ORTIZ LOPEZ,      ) 10:00 a.m.
                               )
               Defendant.      ) Courtroom 14B
_____)
```

**TRANSCRIPT OF SENTENCING HEARING**

BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

*Official Court Reporter:*

*Scott Gamertsfelder, RMR, FCRR*
*801 North Florida Avenue*
*Tampa, Florida 33602*
*Telephone: (813) 301-5898*

*(Proceedings reported by stenotype; Transcript produced by computer-aided transcription.)*

# A P P E A R A N C E S

**GOVERNMENT COUNSEL:**

      **Joseph K. Ruddy, Assistant U.S. Attorney**
United States Attorney's Office
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
(813) 274-6000


**DEFENSE COUNSEL:**

      **Darlene Calzon Barror, Esq.**
Law Office of Darlene Barror
506 North Armenia Avenue
Tampa, Florida 33609
(813) 877-6970

      **Kelly J. Thomas, Esq.**
Thomas Law Office, Inc.
11161 East SR 70
Suite 110, PBM 169
Lakewood Ranch, Florida 34202
(941) 266-7199

      **Alvin E. Entin, Esq.**
Entin, Margules & Della Fera, PA
110 SE 6th Street, Suite 1970
Fort Lauderdale, Florida 33301
(954) 761-7201


          **ALSO PRESENT:**

            William Coker, Agent
U.S. Coast Guard

            Dyalma Ocasio,
Spanish Interpreter

          - - -

# TABLE OF CONTENTS

## EXAMINATIONS

| GOVERNMENT WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| AGENT WILLIAM COKER | 13 | | | |

| DEFENDANT WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DAVID ALEJANDRO YAXCAL | 34 | | | |
| RAUL MENDEZ LOPEZ | 42 | 44 | | |
| YOLANDA OCANA | 50 | | | |
| JUVENTINO REINA RUIZ | 51 | | | |

## EXHIBITS

(No exhibits received)

1                **P R O C E E D I N G S**

2     July 8, 2015                                    10:00 a.m.2

3                           - - -

4               COURT SECURITY OFFICER:  All rise.

5               The United States District Court in and for the

6     Middle District of Florida is now in session.  The Honorable

7     Virginia M. Hernandez Covington presiding.

8               Please be seated.

9               THE COURT:  Good morning.

10              We are here for the sentencing in *United States of*

11    *America versus Juan Alberto Ortiz Lopez*, Case No.

12    8:11-cr-48-T-33EAJ.

13              First thing we will do is swear in the Spanish

14    interpreter, please.

15              THE COURTROOM DEPUTY:  Please raise your right

16    hand.

17              Do you solemnly swear or affirm under the penalty

18    of perjury that you will truly and to the best of your

19    ability translate from English to Spanish and Spanish to

20    English all questions and responses propounded by this Court?

21              THE INTERPRETER:  I do.  Dyalma Ocasio.

22              Good morning, Your Honor.

23              THE COURT:  Thank you, Miss Ocasio.

24              I'll begin by having counsel state their

25    appearance.  Mr. Ruddy.

1          MR. RUDDY:  Good morning, Your Honor.

2          Joseph Ruddy for the government, and with me at

3    counsel table is Special Agent William Coker.

4          THE COURT:  Thank you, Mr. Coker.

5          For the defense.

6          MS. BARROR:  Good morning, Your Honor.

7          Darlene Barror on behalf of Juan Alberto Ortiz

8    Lopez.  Of course, Mr. Lopez is here.  And at counsel table

9    is Kelly Thomas and Alvin Entin.

10          THE COURT:  Thank you very much.

11          And we have from probation Miss Gornbein.  Thank

12   you, Miss Gornbein.

13          Juan Alberto Ortiz Lopez, on January 7th, 2015,

14   you entered a plea of guilty to Count One of the Indictment,

15   charging you with conspiracy to possess with intent to

16   distribute cocaine while on board a vessel subject to the

17   jurisdiction of the United States, in violation of Title 46,

18   United States Code, Sections 70503(a) and 70506(a) and (b);

19   and Title 21, United States Code, Section 960(b)(1)(B)(ii);

20   and Title 18, United States Code, Section 3238.

21          The Court has previously accepted your guilty plea

22   and has adjudged you guilty of that offense.  We have now

23   reached the stage in the proceedings where it is my duty to

24   address several questions to you and your attorney and the

25   counsel for the government.

```
 1            Mr. Ruddy, have you had the opportunity to read
 2   the presentence report?
 3            MR. RUDDY:  I have, Your Honor.
 4            THE COURT:  Do you have any objections as to the
 5   factual accuracy of the report?
 6            MR. RUDDY:  No.
 7            THE COURT:  Do you wish to make any objections to
 8   the probation officer's application of the guidelines?
 9            MR. RUDDY:  No.
10            THE COURT:  Thank you, Mr. Ruddy.
11            Miss Barror, have you had the opportunity to read
12   and discuss with Mr. Ortiz the presentence report?
13            MS. BARROR:  I have, Your Honor.
14            THE COURT:  Do you have any objections as to the
15   factual accuracy of the report?
16            MS. BARROR:  No, Your Honor.
17            THE COURT:  Do you wish to make any objections to
18   the probation officer's application of the guidelines?
19            MS. BARROR:  Yes, I do, Your Honor.
20            THE COURT:  I'll hear you now.  If you wouldn't
21   mind coming up to the podium, please.
22            MS. BARROR:  Yes, Your Honor.
23            Actually, we divided up the objections, if it's
24   all right with the Court, into two section.  I am going to
25   address the 2-point what we call super enhancement, and
```

1    Mr. Entin is going to address the leadership points.  I don't

2    know which one you would like to take first.

3              THE COURT:  Whichever is easiest for you.  I'm

4    familiar with all of these.  And I have read, by the way --

5    and I've allowed this to be filed in camera, the sentencing

6    memorandum, so I'm familiar with that.

7              MS. BARROR:  Thank you, Your Honor.

8              THE COURT:  As well as the objections you filed.

9    Whatever is easier for you is fine by me.

10             MS. BARROR:  I'll start with the two-point

11   enhancement, Your Honor, being that I'm up already, and

12   Mr. Entin perhaps can address the organizer role.

13             THE COURT:  So would that be the paragraph 25?  Is

14   that it?  Is that the ex post facto arguments that you will

15   be addressing?

16             MS. BARROR:  Yes, Your Honor.

17             THE COURT:  Okay.  Go ahead.

18             MS. BARROR:  Your Honor, one argument that I would

19   like to make is just, basically, an equity argument; and that

20   is the fact that, as the Court knows, Mr. Ortiz Lopez already

21   has a very high offense level.

22             THE COURT:  Forty-one, which is a very high level.

23             MS. BARROR:  Yes.  And part of that is made up of

24   two aspects.  One, of course, is that he was trafficking

25   drugs, and there was a large amount of drugs, and that

1  resulted in the level 38.  Then, of course, he has the

2  four-point bump-up for being an organizer, which Mr. Entin is

3  going to address.  But even in our objections, Your Honor, we

4  have never suggested he should not get some kind of a

5  bump-up.  We've just said, not four levels.

6          And, Your Honor, I believe, when we start talking

7  about the specific offense of paragraph 25, it is sort of a

8  double counting.  It again says, well, if he has an

9  aggravating role and if he was involved in the importation of

10  a controlled substance, then he should get two more levels.

11          So in our opinion, he's being punished twice.

12  He's being punished for the offense level, and then being

13  punished for his role in the offense.  And as if that's not

14  enough, he's given another two points for what I believe to

15  be the same situation.

16          THE COURT:  Well, let's see.  We have the one

17  under 3B1.1 and the one in paragraph 27 is Section 3B1.1(a).

18          MS. BARROR:  That's correct, Your Honor.

19          THE COURT:  All right.

20          MS. BARROR:  I think the conduct is very similar

21  and the two points are unnecessary, and I think the Court

22  should consider just the ultimate fairness of that two-point

23  enhancement.  But apart from that, Your Honor, that

24  particular amendment came into effect on November 1st of

25  2010.  It's our position that Mr. Ortiz Lopez's involvement

1   ended by January of 2010, so there is a gap between the time

2   -- it's our position -- that he stopped his conduct and the

3   time that the amendment came into effect, which we believe

4   would violate the ex post facto clause of the Constitution.

5          When I originally objected on this to probation,

6   my understanding was that I was going to receive a

7   description of why the conduct -- why Mr. Ortiz's conduct

8   expanded beyond January of 2010.  I did not receive that

9   expanded explanation, so I still maintain the position that

10  his conduct did end prior to this amendment coming into

11  effect.

12         THE COURT:  Although the probation officer does

13  say that it's the position of the probation office that the

14  specific offense characteristic is appropriately applied, the

15  defendant's participation in this conspiracy began on an

16  unknown date and continued until on or about February 1st,

17  2011, the date of the Indictment.

18         MS. BARROR:  And we cannot disagree, Your Honor,

19  with the dates that are in the Indictment.  Our position is,

20  simply, that Mr. Ortiz Lopez did not participate after

21  January of 2010.

22         THE COURT:  Okay.

23         MS. BARROR:  Quite frankly, in the 25 years I've

24  been in practice, I've never had anyone have this particular

25  enhancement applied.  I know it's relatively new, but I've

1  read the amendment, and it appears to me to be excessive.

2        THE COURT:  All right.  I'm going to ask for a

3  response from the government.  Mr. Ruddy, what's your

4  response to that argument that, in essence, he's being

5  unfairly penalized because there is already an enhancement in

6  paragraph 27 and this is a second enhancement?  Also, the ex

7  post facto clause arguments.

8        MR. RUDDY:  Yes, Your Honor.  I wasn't aware of

9  the double-counting argument.  I thought it was the ex post

10 facto argument she raised.

11       THE COURT:  She raised that today.  She raised it

12 today.  She said that he's being penalized.

13       MR. RUDDY:  I understand.  That ex post facto

14 argument has been raised in other cases -- in maritime cases

15 where a mariner is a boat captain as well as someone who was

16 a leader or organizer, and they are enhanced for their

17 special skill as a mariner and enhanced also for their

18 enhanced role as a manager or supervisor or, in some

19 instances, even an organizer or leader.

20       Those cases, the Eleventh Circuit has held, are

21 appropriate enhancements for both and it is not double

22 counting.  As you pointed out, these are different sections

23 of the sentencing guidelines.

24       THE COURT:  Do you have a case for me, Mr. Ruddy?

25       MR. RUDDY:  Again, Your Honor, if I had had some

1  notice, I could have had something for you, but we are flying

2  off that --

3          THE COURT:  But you are confident that's what the

4  Eleventh Circuit case law would provide for?

5          MR. RUDDY:  Yes, Your Honor.  Yes, Your Honor.

6          THE COURT:  So it's your position, basically, that

7  it's a different section that we are going on.

8          MR. RUDDY:  Yes.

9          THE COURT:  Even if there weren't Eleventh Circuit

10  case law, common sense tells you, if you are going under a

11  different section, it really isn't the double counting.

12          MR. RUDDY:  Correct.

13          THE COURT:  All right.  What's your response as to

14  the ex post facto?

15          MR. RUDDY:  For the ex post facto, Your Honor, the

16  Indictment charges for an unknown date until the time of the

17  Indictment, which continues into 2011, and the defendant did

18  not withdraw from that conspiracy.  There was no withdrawal.

19          He can say he stopped.  But the fact of the matter

20  is, there were shootouts in Guatemala during this time period

21  that involved the defendant and his rival drug trafficking

22  organization.  Disputes over territory or money or whatever.

23  And the conspiracy, as charged, continues past the date of

24  November 2010.  Clearly, the cocaine that he was involved in

25  trafficking, which exceeded, by his own estimate, 140,000

 1  kilos, was destined for the United States.

 2           THE COURT:  Is that what he's being held

 3  accountable for?

 4           MR. RUDDY:  Your Honor, we had one supplier who

 5  indicated he had supplied him with 40 tons.

 6           THE COURT:  That's what I thought.  I thought it

 7  was a different amount.

 8           MR. RUDDY:  By his own estimate, he says he

 9  trafficked from 1998 through 2010, until his arrest -- until

10  he was arrested, 144,000 kilos, over 144 tons.

11           THE COURT:  You've got your case agent here.  Is

12  there a proffer that either one of you can make with respect

13  to when his involvement stopped?  In other words, she has

14  alleged that his involvement stopped, so therefore it's not

15  appropriate for the Court to apply the enhancement.

16           Your information is that -- or what you have set

17  forth is that that's not correct.  It's simply what he says.

18           Do you have something that you can relay to the

19  Court so that's clear on the record other than what you've

20  just said?

21           MR. RUDDY:  The agent is available.  I'll put him

22  on the stand.

23           THE COURT:  Sir, do you want to come forward,

24  please.  I'm going to place you under oath.  Will you raise

25  your right hand, please.

1          Do you swear that the testimony you are about to
2  give is the truth, the whole truth, and nothing but the truth
3  so help you God?
4          THE WITNESS:  Yes, ma'am.
5          THE COURT:  We will go ahead and put you in the
6  witness box, and we already know your name.  It's William
7  Coker, and you are -- is it the Coast Guard Investigative
8  Services?
9          THE WITNESS:  That is correct.
10          THE COURT:  You are a special agent.  All right.
11  Very good.  Let's cut right to the chase, Mr. Ruddy.  Go
12  ahead, sir.
13                      DIRECT EXAMINATION
14  BY MR. RUDDY:
15  Q.    Okay.  Agent Coker, you have been the case agent on
16  this investigation, correct?
17  A.    Yes.
18  Q.    And you were involved in the investigation that lead to
19  the Indictment?
20  A.    That's correct.
21  Q.    And you've interviewed people both prior to the
22  Indictment and subsequent to the Indictment involving
23  Mr. Ortiz Lopez?
24  A.    That's correct.
25  Q.    And in your assessment, in Guatemala, from late 1990s

1  to his arrest in March of 2011, was there a larger trafficker

2  in Guatemala than Mr. Ortiz Lopez?

3  A.     Was there a larger one?

4  Q.     Yes.

5  A.     No, sir.

6  Q.     Okay.  And during the course of your -- and,

7  specifically, what did he do?

8  A.     With his organization?

9  Q.     Correct.

10 A.     He imported.  What he admitted to was about 144,000

11 kilos from a Colombian trafficker that had been arrested; and

12 we got his books from his accountants, and we accounted for

13 almost 144,000 kilos in the accounting books from the

14 accountant of the Colombian that these books -- these

15 accounting ledgers were used in his pleadings.  So they were

16 already involved in the court.

17        And we went through those with him, he admitted to

18 them and a couple of other cases.  But other than

19 trafficking, he controlled the entire zone of the San Marcos

20 Region of Guatemala, which borders with Mexico.  And any

21 drugs that came through his area, if they weren't his, he

22 charged a tax on them.

23        And there was also rival shootouts between other

24 narcotics smugglers down there.  One was in Telefaturo, a

25 mall where two policemen and a preacher got killed.

1  Q.    And did this activity continue up until the time he was

2  arrested?

3  A.    Yes, sir.

4  Q.    Okay.  And that was in March 30th, 2011?

5  A.    Yes, sir.

6  Q.    Okay.

7            THE COURT:  Thank you, Mr. Ruddy.

8            Any cross-examination on these limited points,

9  Miss Barror?

10           MS. BARROR:  No, Your Honor.

11           THE COURT:  Okay.  Thank you.  The witness is

12  excused.

13           I think that it was appropriately scored,

14  Mr. Ruddy.  I don't know if there is anything you want to say

15  in summation; but based on what I've heard today, I have two

16  conclusions:

17           No. 1, it does not violate the ex post facto

18  clause based on what the witness just testified to.  And this

19  is a different section of the sentencing guidelines, so I

20  don't think that it's double counting.

21           So that objection is noted for the record,

22  Miss Barror, but your objection is overruled.

23           All right.  I'll hear the next argument, then.

24  This is from Mr. Entin, sir.

25           MR. ENTIN:  Yes, Your Honor.

1          Your Honor, let me preface this by saying that the

2   objection to the four points for leadership is in no way an

3   attempt to avoid responsibility for what Mr. Ortiz Lopez has

4   pled guilty to.

5          THE COURT:  I understand that.  I understand you

6   are doing your job here of trying to make certain that it's

7   appropriately scored, and I know they are two different

8   things.  Thank you, Mr. Entin.

9          MR. ENTIN:  Our position is twofold.  One,

10  Your Honor, under the case of *United States versus Milton*,

11  which is 153 F.3d 891, which is an Eighth Circuit case, it

12  points out that the government's burden is to -- the burden

13  of proof on enhancements lie with the government.

14         The only thing that we have before us, Your Honor,

15  in terms of what Mr. Ortiz Lopez's role was is contained in

16  the Presentence Investigation Report, which basically talks

17  about the extensiveness of the conduct.

18         The case law, at least in the Eleventh Circuit, as

19  found in the case of *United States versus Smalls*, which was

20  out of the -- originally out of the Southern District of

21  Georgia, but relies strongly on the case of the *United States*

22  *versus Bennett*, which is an Eleventh Circuit case from 2006,

23  the holding of the Eleventh Circuit is that 3B1 requires both

24  a leadership role and an extensive operation and that the

25  operation's extensiveness is insufficient as a matter of law

1    to warrant the adjustment.  That, of course, comes from the

2    *United States versus Alred*, which is found at 144 F.3d 1405.

3           In this particular case, Your Honor, it is clear

4    that Mr. Ortiz Lopez -- and I think that's clear through the

5    plea agreement and through the PSI -- did not own the

6    underlying cocaine in this case.

7           What Mr. Ortiz Lopez had to do was he was

8    responsible for an aspect of a much larger cocaine operation

9    that was run out of Colombia and that his role was more along

10    the lines of a manager or supervisor of a transportation arm

11    of this much larger cocaine organization, which would merit

12    an increase of only two or three points for leadership as

13    opposed to four.

14           There is nothing here to show in the record that

15    Mr. Ortiz Lopez has, in fact, done anything consistent with

16    the definition of leadership as laid out by the probation

17    officer in the final revised presentence investigation and,

18    that is, a participant -- you have to supervise at least one

19    participant who is criminally responsible.

20           There is no mention in the PSI of one participant

21    who is criminally responsible that was actually supervised by

22    Mr. Ortiz Lopez, nor is there any indication that he received

23    a greater share of the profits, nor is there an indication

24    that he did anything more than work as a manager or

25    supervisor for the leader of the actual cocaine organization.

1    As such, he should not be treated on the same level as the

2    actual leader of the cocaine organization, but should be

3    treated as a manager or supervisor.

4            As such, we would ask for the government to meet

5    its burden with regard to one criminally responsible

6    individual that he supervised; and, then, on top of that to

7    show us why he is anything more than a manager or supervisor

8    as opposed to a leader of this overall organization.

9            Thank you, Judge.

10           THE COURT:  Thank you, Mr. Entin.

11           Mr. Ruddy, do you wish to respond, sir?

12           MR. RUDDY:  Yes, Your Honor.

13           The Eleventh Circuit has consistently indicated as

14   to the guidelines that there is no limit or number of people

15   that can be deemed to be an organizer or leader.  And that

16   term is not the equivalent of a kingpin or boss, but anyone

17   who meets the qualifications under the guidelines of 3B1.1.

18           Here, the defendant operated a significant

19   organization that was involved in extensive international

20   trafficking of cocaine in large multi-ton quantities on an

21   annual basis.  His role was to receive it -- have

22   transportation organizations that would receive the drugs

23   from vessels in the Eastern Pacific Ocean and/or the

24   Caribbean, bring them to Guatemala, and he would then

25   transport them to Mexico and turn them over to suppliers

1  there.

2          He dealt with Valendia, a hundred-tons-a-year

3  cocaine trafficker.  Mr. Luis Caiceco was a four-level leader

4  and organizer.  Mr. Ortiz Lopez is the same in terms of being

5  a leader and organizer.  He had different transportation

6  organizations that he employed to go receive these drugs, and

7  this continued for many years.

8          Did he receive an excessive amount of profits for

9  it?  He has eight fincas -- eight fincas in Guatemala.  He

10  has 28 children.  He supports all of them.

11          In their motion, they are talking about how he

12  builds hospitals and gives money to charities to help

13  underprivileged children.  This man worked in Los Angeles as

14  a drywall installer for two years in the early '90s.  He was

15  born poor, penniless.  Now he has eight fincas.  His money

16  came from one source.  Cocaine trafficking.

17          THE COURT:  Thank you, Mr. Ruddy.

18          The objection is noted but overruled.  I think the

19  probation officer correctly scored it.  As she says in the

20  addendum, "The international drug smuggling conspiracy is

21  viewed as extensive and involved five or more participants.

22          "The defendant used numerous other persons to

23  assist him in the operations of his drug smuggling

24  organization, including maritime transportation organizations

25  responsible for picking up cocaine on the high seas and

1   smuggling it into Guatemala.  The defendant also exercised

2   management responsibility over property, assets, and

3   activities of the criminal organization.  The conspiracy

4   spanned approximately a decade and was a sophisticated

5   transnational gross smuggling operation."

6           It's appropriately scored, so the objection is

7   noted but overruled.

8           Any other objections to the application of

9   guidelines, Miss Barror?

10          MS. BARROR:  There are none, Your Honor.

11          THE COURT:  Okay.  Thank you, Miss Barror.

12          The Court adopts the undisputed factual statements

13  and guideline applications contained in the presentence

14  report.  As to the controverted factual statements and

15  guideline applications, the Court adopts the position of the

16  probation office as stated in the addendum.

17          Therefore, the Court determines that the advisory

18  guidelines are:  Total Offense Level 41, Criminal History

19  Category I, 324 months' to 405 months' imprisonment, five

20  years supervised release, restitution is not applicable,

21  $25,000 to a $10 million fine, and a $100 special assessment.

22          Mr. Ruddy, I will hear your motion now for

23  downward departure of defendant's sentence based upon

24  substantial assistance.  And you are asking for a two-level

25  reduction.

1          MR. RUDDY:  That is correct, Your Honor.

2          Mr. Ortiz Lopez arrived here in May of 2014.  He

3  began to debrief with Agent Coker shortly after his arrival.

4  Unfortunately, it appears that these debriefings have not

5  netted or produced any indictments or seizures, with one

6  exception that we can talk about today.  That's why it's a

7  two level -- motion for two levels.

8          It was an interdiction that occurred last summer,

9  2014, late June, early July, in the Eastern Pacific Ocean.

10  There were a number of people interdicted and turned over to

11  the Guatemalan authorities for prosecution.  There were

12  several hundred -- I believe it was 300, 400 kilos seized.

13  That case was prosecuted in Guatemala.

14          There have been no --

15          THE COURT:  So that case was prosecuted not by the

16  United States?

17          MR. RUDDY:  Correct, Your Honor.  Yes, Your Honor.

18  For logistical reasons, the United States didn't have Coast

19  Guard and Navy assets in the position to interdict the

20  vessel, so it was entered into by Guatemalan authorities.

21  But that is the extent of the cooperation that would justify

22  a 5K motion today.

23          THE COURT:  I'm just curious, Mr. Ruddy.  Has he

24  agreed to forfeit any assets?  Has the United States

25  government recovered any of these fincas or anything else

1 that's subject to forfeiture?

2 　　　　MR. RUDDY:  That is being done by the Guatemala

3 authorities.  And as you may be -- I'm sure you are aware.

4 You've read the defendant's sentencing memorandum.  He is

5 fighting that.  But clearly these are -- as you are well

6 aware, Your Honor, with many assets in foreign countries, the

7 United State's ability to forfeit those are limited.

8 　　　　THE COURT:  Of course.  I understand that.  It

9 takes either a joint effort; or if the property is located

10 overseas, the other country has to actually do the forfeiting

11 of it.

12 　　　　MR. RUDDY:  Correct.  Guatemala is attempting to

13 do that.  The defendant is fighting that.

14 　　　　Clearly, he grew up with no money.  He gained his

15 money through illegal activity, specifically, trafficking in

16 cocaine over an extended period of time.  These are the

17 results of his illegal activity.  The government of Guatemala

18 certainly should have the ability to forfeit those as the

19 result of proceeds of his illegal conduct.

20 　　　　THE COURT:  All right.  So I think based on that,

21 based on all the information, that a two-level reduction is

22 appropriate.  Sometimes I've seen four-level reductions when

23 it's information about another case; but you are, obviously,

24 a very experienced Assistant U.S. Attorney, and based on your

25 experience and evaluation of this matter, you think that two

1    levels is appropriate?

2            MR. RUDDY:  Yes, Your Honor.  Agent Coker has

3    interviewed Mr. Ortiz Lopez 15 times, maybe more.  There have

4    been many names mentioned, but no substantive details, or

5    very few to date.

6            THE COURT:  Go ahead.

7            MR. RUDDY:  In the disparity memorandum that the

8    defense filed, they cited other cases.  Caiceco Valendia

9    being one of them, and others.  Those individuals were facing

10   the same kind of guideline range calculation that Mr. Ortiz

11   Lopez is today.

12           They knew when they surrendered or when they were

13   apprehended and brought to the United States that they were

14   going to be looking at these kinds of guideline ranges, and

15   they cooperated extensively.

16           Mr. Caiceco Valendia turned over $115 million in

17   Panama and Colombia.  He debriefed on every trafficker from

18   tooth to tail; that is, from the labs to the distribution

19   organizations in Mexico and the United States, against the

20   highest level of traffickers to the lab workers.  He

21   cooperated against everybody in minute detail.

22           He received a sentence that reflected his

23   cooperation.  That is how people in Mr. Ortiz Lopez's

24   situation reduce their sentence.  They cooperate against

25   anybody and everybody they dealt with.  Mr. Ortiz Lopez, at

1    least to date, has not done that.

2              THE COURT:  All right.  Thank you very much.  I

3    appreciate that.

4              Do you wish to respond to that, Miss Barror?

5              MS. BARROR:  I do, Your Honor.  Actually --

6              THE COURT:  Mr. Thomas?

7              MS. BARROR:  -- Mr. Thomas is going to respond to

8    that aspect, and then I would just like to mention the

9    forfeit issue very briefly.

10             THE COURT:  Sure.  Fair enough.  Let me hear from

11   Mr. Thomas first with respect to the 5K motion.

12             MR. THOMAS:  Thank you, Your Honor.  Nice to see

13   you again.

14             THE COURT:  Nice to see you, Mr. Thomas.

15             MR. THOMAS:  The defense requests the four levels

16   under the 5K for the following reasons:  No. 1, Mr. Ruddy is

17   correct.  He's been debriefed over and over and over again,

18   not only by this case agent, Mr. Coker, but by other agents

19   in the Tampa area, but also by agents in Miami.

20             With the Court's permission, I will hand up a

21   cooperation summary.

22             (Document tendered.)

23             THE COURT:  Thank you.

24             MR. THOMAS:  Your Honor, I'm not going to go into

25   any detail on each individual one unless you ask, and I

1   suggest it be done at sidebar in light of what's involved.

2   But I would note the debriefings list dozens and dozens of

3   narco traffickers in South America and Central America,

4   provided by the defendant.

5          We also mentioned the seizure on June 29th, and

6   the Court -- it's my understanding, and I can be corrected,

7   that it was one ton of cocaine on the vessel and four or five

8   mariners arrested in Guatemala.

9          You also see on the Page 3, in the middle,

10  corruption matters, which are very important for the

11  United States to know which areas are controlled by the

12  police officers that will not affect enforcement, who may, in

13  fact, steal the cocaine or advise other officials about drug

14  investigations.

15         What I would like to address the Court's attention

16  to regarding the 5K is the very last entry on Page 4.

17         THE COURT:  All right.

18         MR. THOMAS:  In that -- I learned yesterday that

19  there is a sealed indictment in Miami based upon information

20  provided by the defendant.

21         Now, as soon as I found out that information,

22  which was late yesterday afternoon, I did send an e-mail to

23  all parties involved, notifying them of the indictment.  So

24  based on the seizure, the information on dozens of

25  individuals, and the indictment that can be attributed to

1    Mr. Ortiz, we would suggest a four-level 5K.

2              THE COURT:  So we are clear, I will accept this

3    under seal, if that's okay with you, Mr. Thomas, that I keep

4    this under seal.

5              MR. THOMAS:  Yes, Your Honor.

6              THE COURT:  It's the last entry on Page 4.

7              MR. THOMAS:  Yes, ma'am.  Thank you.

8              THE COURT:  All right.  Thank you.

9              Mr. Thomas, I appreciate that.  You've made a very

10   good argument to the Court as to giving me additional

11   information as to whether two versus four levels is

12   appropriate.

13             I will tell you, generally speaking, I go with

14   what the government recommends.  Why?  Because they have as

15   much of a vested interest as anybody does in making certain

16   that individuals are rewarded for their cooperation.  If

17   defendants think that the government is not giving them their

18   fair shake, the government is going to lose and will not have

19   this cooperation down the road.

20             So while it's a close call -- I've seen four

21   levels on cases like this.  I have also seen two levels.

22   I've seen both.  Based on what Mr. Ruddy is telling me, I do

23   think two levels is appropriate.  It sounds as if there is

24   additional information that may come down the pike -- right,

25   Mr. Ruddy, for a Rule 35?

 1              MR. RUDDY:   We are hopeful.

 2              THE COURT:   That's right.   I bet you are.   And so

 3    I think that based on what I'm hearing today, I think two

 4    levels is appropriate, Mr. Thomas.   But certainly your client

 5    can participate and provide additional information and a

 6    Rule 35 will be forthcoming.

 7              So I will grant the government's motion for two

 8    levels.   That means it goes from a Total Offense Level 41 to

 9    a Total Offense Level 39, Criminal History Category I.   It's

10    262 months to 327 months.

11              Is that right, Miss Gornbein?

12              THE PROBATION OFFICER:   Yes, Your Honor.

13              THE COURT:   Thank you, Miss Gornbein.

14              Five years supervised release; restitution is not

15    applicable.

16              Does the fine remain the same?

17              THE PROBATION OFFICER:   It does, Your Honor.

18              THE COURT:   Fine is the same, and a $100 special

19    assessment.   So that's where we are at.

20              Mr. Ruddy, do you know of any reason why this

21    Court should not now proceed with imposition of sentence?

22              MR. RUDDY:   I do not, Your Honor.

23              THE COURT:   Do you wish to make a statement with

24    respect to what an appropriate sentence for this gentleman

25    would be?

1          MR. RUDDY:  Your Honor, anywhere within the

2  guideline range.  The Court has discretion on that.

3          THE COURT:  There were no promises made with

4  respect to low end or anything like that?

5          MR. RUDDY:  I don't believe so, but -- I don't

6  believe so.

7          THE COURT:  Anywhere from 262 to 327 months.

8  Thank you, Mr. Ruddy.

9          Miss Barror, do you know of any reason why this

10  court should not now proceed with imposition of sentence?

11          MS. BARROR:  Yes, Your Honor.  And we would like

12  to share with the Court some of the mitigating factors that

13  were part of the sentencing memorandum.

14          THE COURT:  That's certainly fine.  This is your

15  opportunity to make a statement, present any information in

16  mitigation of the sentence.  And, likewise, I need to inform

17  your client.

18          Mr. Ortiz, you have the right to address the Court

19  directly.  You don't have to, sir, but I want to make certain

20  that you understand that you have that right.

21          Do you understand that, Mr. Ortiz?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Okay.  Very good.

24          Miss Barror, I'm happy to hear you now and also

25  for you to address the forfeiture issues or any other 3553

```
 1   factors.

 2             MS. BARROR:  Yes, Your Honor.

 3             THE COURT:  By the way, I appreciate your

 4   sentencing memorandum.  It is appropriate to file it under

 5   seal.  I granted that, and I reviewed that extensively

 6   yesterday.

 7             MS. BARROR:  Thank you very much, Your Honor.

 8             Your Honor, briefly, I would like to address the

 9   forfeiture issue because I don't want the Court to believe

10   that Mr. Ortiz is trying to fight the judicial system in

11   terms of taking away his property.

12             Obviously, he would like to keep some of his

13   property.  He does have children to support and family

14   members; but early on -- and I know that Your Honor is really

15   the forfeiture expert, but early on --

16             THE COURT:  I was.  Not anymore.

17             MS. BARROR:  -- not being tremendously familiar

18   with forfeitures, especially involving foreign countries, I

19   approached Agent Coker and said, you know, can't we work

20   something out where maybe the U.S. can get some of the

21   properties and Guatemala can have some, because I know that

22   will be a feather in Mr. Ortiz's cap if we could turn

23   something in.  I think Agent Coker liked the idea.

24             Somewhere down the road we were told we could not

25   interfere with anything that Guatemala was doing.  I always
```

1  wanted to try to get the U.S. some assets because I wanted it

2  to count for Mr. Ortiz Lopez's credit.

3         THE COURT:  Sure.  But how do you respond to

4  Mr. Ruddy's statement that he's contesting those forfeitures

5  in Guatemala?

6         If these were assets in the United States, I can

7  tell you very clearly that if you don't agree to cooperate in

8  turning over all of these assets, except what legitimately

9  belongs to an innocent spouse or an innocent third-party, you

10 at least need to take all steps to turn over those assets to

11 the government.  Otherwise, you're not going to get a

12 cooperation reduction in the plea agreement.  That's standard

13 operating procedure going back 25 years at the U.S.

14 Attorney's Office.

15        MS. BARROR:  Sure.

16        THE COURT:  Property in other countries, honestly,

17 I don't know what the practice is today except that normally

18 if you plead guilty, you have to agree to cooperate, and that

19 means being debriefed and being truthful.  And if you

20 illegally acquired a piece of property with drug proceeds,

21 it's forfeitable to a government.  It doesn't -- the law says

22 it doesn't belong to you because you acquired it with illicit

23 funds.  It's subject to forfeitures to a government.  I don't

24 know what happened there.

25        MS. BARROR:  It's very complex, Your Honor.  It

1   started off with, my understanding, the extradition

2   proceeding itself where Mr. Ortiz believed that the

3   extradition would be used by the Guatemalan government to

4   take away his properties.

5          My understanding -- and we have be given a number

6   of documents, and I'm no expert in Guatemalan law, but it

7   appears that evidence was supposed to be presented to the

8   Guatemalan government within 40 days, and it took a little

9   longer, but Guatemala still went forward and started the

10  forfeiture proceedings.

11         Quite frankly, from a very selfish point of view,

12  I didn't want Guatemala to take everything, because if

13  Guatemala took everything, we could never be in a situation

14  like Luis Caiceco was in where he turned in $115 million to

15  the U.S. government, because we wouldn't have anything to

16  turn in because everything would be taken away.

17         THE COURT:  Well, but cooperating with another

18  government is still cooperation.  It is, Miss Barror.  Even

19  if you cooperated with another government, it would still be

20  cooperation.

21         MS. BARROR:  I asked that question specifically,

22  Your Honor, of whether he was going to get any credit for

23  things that Guatemala takes, and I never received a very

24  definite answer that that was going to count or help him in

25  any way.

1          Whether he loses it to the U.S. or whether he

2   loses it to Guatemala, he's still going to lose it; but my

3   hope had been that we could turn something in to the U.S.

4   government.  And it did not seem that the United States was

5   interested in trying to stop the Guatemalan government from

6   seizing what they believed that they should.  And I don't

7   know the State Department's position on that, and I had to

8   follow Mr. Ruddy's lead that --

9          THE COURT:  It's understandable.  We should not be

10  interfering in another country's forfeit.  That would be

11  absolutely wrong, and the United States government doesn't do

12  that.  It's up to another country to do it.  But what the

13  prosecutor's office has control over, to a certain extent, is

14  that if this gentleman is going to receive a reduction for

15  cooperation, that he, indeed, did cooperate.

16          And I don't think it makes that much of a

17  difference who the government is, whether it's the government

18  of Guatemala who forfeits these properties or the

19  United States government.  It's still that cooperation.

20  That's what we are talking about here.  But it's not the

21  be-all and end-all.  It's just one more thing we talk about

22  in the scheme of things.  I understand, more or less, what's

23  going on here.

24          MS. BARROR:  We wanted to be as helpful as we

25  could be, but it was our position -- or we believed that the

1    only way that he would gain any kind of credit would be if

2    the U.S. government received something.

3            THE COURT:  All right.  Let's go ahead and then

4    move on to the 3553 factors.

5            MS. BARROR:  Yes, Your Honor.

6            I would like to start with the inhumane conditions

7    at the Guatemalan prisons where Mr. Ortiz was housed for

8    three years, and I think the Court has in front of you his

9    affidavit of --

10           THE COURT:  I do.  I reviewed that yesterday.

11           MS. BARROR:  -- the conditions that he had to

12   withstand.

13           THE COURT:  I remember you filed an emergency

14   motion with respect to that; did you not?  And I had to order

15   a doctor to see him so that he could be evaluated for his

16   medical problems.

17           MS. BARROR:  That's correct, Your Honor.

18           Actually, today we have Dr. David Alejandro Yaxcal

19   that has come from Guatemala.  His testimony is going to be

20   very brief; but it will, I think, show the Court that in

21   Guatemala his orders were not being followed and Mr. Ortiz

22   did not receive the medical treatment that he needed.

23           THE COURT:  All right.  Why don't you bring him

24   forward, then.  He can either proffer or testify, whatever we

25   think will be easiest.  Does he speak Spanish?

1          MS. BARROR:  English and Spanish.  He says

2    Spanish.

3          THE COURT:  We have an interpreter.  She is going

4    to have to translate it in English for the record.  Raise

5    your right hand, please.  Do it in English and she will

6    translate it to him.

7          THE COURTROOM DEPUTY:  Please raise your right

8    hand.

9          Do you solemnly swear or affirm under penalty of

10   perjury that the testimony you shall give in this cause will

11   be the truth, the whole truth, and nothing but the truth?

12         THE WITNESS:  Yes, I swear.

13         THE COURT:  All right.

14         THE COURTROOM DEPUTY:  State your name and spell

15   your last name for the record.

16         THE WITNESS:  David Alejandro Yaxcal, Y-a-x-c-a-l.

17         THE COURT:  All right.  Thank you.

18         Miss Barror, you can go ahead and ask him the

19   questions, but I ask you that you please tailor the questions

20   so that the specific information we need is elicited.

21         MS. BARROR:  Yes, Your Honor.

22              DAVID ALEJANDRO YAXCAL,

23   having been first duly sworn by the Courtroom Deputy,

24   testified as follows:

25              DIRECT EXAMINATION

BY MS. BARROR:

Q.    Doctor, you treated Mr. Juan Alberto Ortiz Lopez while

he was in prison in Guatemala?

A.    Yes.

Q.    And can you briefly describe what you were treating him

for?

A.    The patient was taken to the hospital where I work.  He

had been attended to very quickly, and they had made a

diagnostic mistake.  So upon evaluating him, we recommended

that he be hospitalized for treatment.  And for some reason,

they refused to leave him at the hospital.

        Later on, they did some procedures for his

treatment and diagnosis, but without following the adequate

conditions required by those processes and for the surgery.

So they did not allow me to continue giving him treatment;

and they started performing those procedures directly on him,

causing complications in the future.  That's all.

Q.    Sir, after he received the surgical treatment, was he

allowed to stay in the hospital?

A.    No.

Q.    And was he transported directly to -- back to the jail?

A.    Yes.

Q.    And did they provide any type of medication, pain

medication or other medication for him?

A.    His medical file does not show what they gave him

1   afterwards.

2   Q.    Okay.  And did you prescribe anything for him?

3   A.    No, because they did not allow me to see him.

4              MS. BARROR:  Thank you, Doctor.

5              THE COURT:  Thank you.  Any cross-examination of

6   this witness?

7              MR. RUDDY:  No questions, Your Honor.

8              THE COURT:  Tell the Doctor thank you very much

9   for coming here to testify.

10             And would you translate that for the defendant?

11  He didn't have that last statement translated.

12             MS. BARROR:  Do you want me to do that?

13             THE COURT:  She's going to go back there.  Thank

14  you so much.  All right.

15             (Brief pause for translation.)

16             MS. BARROR:  Your Honor, as our memorandum cites,

17  the conditions in the prison were terrible, and he was there

18  for three years.  He was regularly beaten with batons.  He

19  was -- I guess because it was believed he had some money, the

20  guards charged him a thousand dollars a month just to ensure

21  his safety.  He was not permitted to go out of the cell.  He

22  was in isolation.  He couldn't have any contact with his

23  family.

24             Then, as the attachment to the memorandum shows,

25  there was a massive prison riot in November of 2012.  At that

1  point he was held hostage.  I guess the deputies had no

2  control over what the prison gangs were doing, and his family

3  had to pay $5,000 for him to be released from the gang hold.

4  He thought during that period of time he could be killed at

5  any point if something didn't go according to the gang's plan.

6          Then he was transferred to the next prison in

7  Guatemala, Montemorelos, and he developed this kidney

8  condition that the Court had to address once he got here.

9  But in Montemorelos, he was sent to the hospital for surgery;

10  and as the doctor said, protocol was not followed.  His

11  directions were not followed.

12          In his affidavit, he says he was sent back to the

13  prison immediately after the surgery with no pain medication.

14  He had got an infection, had a lot of pain.  The guards would

15  require him to do morning exercises.  These morning

16  exercises, he said, were very, very difficult for him because

17  he had a catheter in place.  And when he could not do the

18  morning exercises, which he said were at 4 o'clock in the

19  morning and done in the nude, they would kick him repeatedly.

20          He had a number of ailments related to this

21  incarceration.  The prisons themselves, and I guess that's

22  part of the condition in Guatemala, but there is no heat.  No

23  relief from the heat in the summer, nor any heat in the

24  winter.

25          The Department of State -- the United States

1   Department of State issued an opinion on the conditions of

2   the Guatemala prisons in the attachment that I have to our

3   sentencing memorandum where they label the conditions as

4   being inhumane.

5            THE COURT:  All right.

6            MS. BARROR:  And, of course, Your Honor, there is

7   a series of cases which we have cited in our memo that allow

8   the Court to give extra credit or some type of downward

9   departure for being housed in these conditions.

10            It would be our prayer, Your Honor, that he spent

11   three years in these horrible pretrial detention conditions,

12   that the Court give him basically one day credit for every

13   day he spent in there, in addition to the credit for the day,

14   which would be two days for every day that he spent.

15            Depending where we wind up on the guideline,

16   Your Honor, that if the Court were inclined to give him a

17   three-year credit in addition to the three years that he

18   spent in the prison, it might be a one- to two-level

19   reduction depending on what guideline we fall into, but we

20   would be asking for a 36-month departure based on the

21   conditions.

22            The courts have upheld in the Eleventh Circuit,

23   *United States versus Presley,* that such a departure is

24   appropriate because it's outside of the heartland of the

25   applicable guidelines because, of course, the guidelines are

1   based on what a defendant would be exposed to if they were

2   being housed here in the United States.  The guidelines don't

3   take into account the conditions in other prisons.

4          So in *Presley*, the Court found sufficient facts

5   and circumstances and opined that the case was outside of the

6   heartland of the applicable guidelines.

7          In some cases, Your Honor, the courts have

8   departed considerably more than what we are asking for, which

9   is an extra day credit for every day served.  There was a

10  case, Your Honor, in which the Court departed 42 percent

11  based upon the harsh pretrial conditions, and the Court of

12  Appeals found that to be excessive.

13         We are, obviously, not asking for 42 percent

14  reduction based on that, Your Honor, but we would ask for

15  that two-day credit for each day that he spent in the

16  Guatemalan prison.  And I think in most cases it falls

17  between a one- and two-level reduction, so I would ask the

18  Court to consider the two-level reduction -- or departure.

19         I know that the Court is well aware of the

20  circumstances because, of course, when he came here, when he

21  was extradited here, he still had the catheter, which should

22  have been removed before his extradition; and we had to, of

23  course, do the emergency motion to the Court, which the Court

24  immediately responded to, and he was taken to a specialist

25  and the specialist removed the catheter, suggesting to the

1  defendant that there could be some permanent damage to his

2  kidney.  But we did everything through the Court's order, and

3  we were able to get him regular medical attention once he got

4  here.

5           I know the Court even followed up afterwards to

6  make sure that he was doing better; and he has received

7  regular medical treatments since he has been here,

8  Your Honor, but the conditions in the Guatemalan prison were

9  horrible.

10          THE COURT:  All right.  Any other 3553 factors you

11  would like to call to the Court's attention?

12          MS. BARROR:  Yes, Your Honor.

13          Your Honor, we would also like to call to the

14  Court's attention the fact that this defendant, while he did

15  earn his money illegally, he came from a very poor

16  background.  A number of children in his own family didn't

17  have shoes growing up and had very little opportunity.  So

18  when he did make money, which started off in the drug

19  trafficking business, then he took those funds, Your Honor,

20  and he utilized them in businesses that were legitimate

21  businesses.

22          He created a hydroelectric plant for the Indian

23  tribes that did not have electricity.  He constructed -- he

24  formed a construction company that employed people making

25  roads to go through these mountainous regions where the

1  Indian tribes did not have a way of really engaging in trade

2  because they didn't have any roads.

3          He never forgot where he came from, and I know

4  that there is a series of cases mentioned in my memorandum

5  that talks about the fact that the Court can consider the

6  good works of the defendant.

7          We have included in our memorandum, Your Honor, a

8  number of churches that he built, schools that he built.  We

9  have included photographs of these places, Your Honor, and a

10  lot of people signed that he had helped them in a variety of

11  ways.  They didn't have money.  He provided medical care; he

12  provided food; he provided sports equipment for schools that

13  wanted to start sports and didn't have any equipment.  He

14  built schools.

15          I have today, Your Honor, one person, one pastor

16  from Guatemala that was involved in some of his good works,

17  and his name is Raul Mendez, and I would like him to come

18  forward.

19          THE COURT:  Absolutely.

20          (Through Spanish interpreter:)

21          THE COURTROOM DEPUTY:  Please raise your right

22  hand.

23          Do you solemnly swear or affirm under penalty of

24  perjury that the testimony you shall give in this cause will

25  be the truth, the whole truth, and nothing but the truth?

```
 1              THE WITNESS:  I swear before the God that I serve

 2   and before all of you because the Bible says that no liar

 3   will inherit God's kingdom.

 4              THE COURTROOM DEPUTY:  Thank you.  Please state

 5   your name and spell your last name for the record.

 6              THE WITNESS:  Raul Timoteo Mendez Lopez.

 7                   RAUL TIMOTEO MENDEZ LOPEZ,

 8   having been first duly sworn by the Courtroom Deputy,

 9   testified as follows:

10                        DIRECT EXAMINATION

11   BY MS. BARROR:

12   Q.    Sir, are you pastor of a church in Guatemala?

13   A.    Yes.  I am the pastor of the church in Vajello Pedro

14   San Marcos.

15   Q.    And, sir, do you know Juan Alberto Ortiz Lopez?

16   A.    Yes, I know him.

17   Q.    Did you have occasion to receive from him help for your

18   church?

19   A.    Yes.  I was looking for help in order to construct a

20   temple, and he gave us -- he gave me help so that I could

21   build that temple.

22              THE INTERPRETER:  May the interpreter inquire?

23              THE COURT:  Yes.

24              (Discussion between interpreter and witness.)

25              THE WITNESS:  And it wasn't just me.  It was
```

1  several of us that he would give contributions to, more or

2  less according to the financial level of the community.  For

3  example, what I want to say is that there are some rural

4  churches where there is very scarce financial resources, and

5  I would give a little bit of money to the pastors.  For

6  example, 300 quetzales would be enough to sustain themselves

7  and their families.

8  BY MS. BARROR:

9  Q.    And did you observe him providing this to other

10  churches, sir?

11  A.    Yes.  When it was Christmastime, he would search out

12  for the poorest of the children who had no gifts for

13  Christmas, and he would give them a little gift so they would

14  be happy for Christmas.

15  Q.    Sir, is there any other good works in the community

16  that you yourself witnessed?

17  A.    In fact, he saw that there were some pastors who had

18  their -- the collar frayed, and then he would give them money

19  so that they can buy their new collars.  In fact, he gave me

20  my entire attire as a pastor.  And as God is our witness, we

21  want to look appropriately, and often we don't have the money

22  to do it.

23  Q.    Sir, is there anything else you would like to share?

24  A.    In fact, there were some people that did not have

25  enough money to be able to purchase their medication; and he

```
 1   would say, if I had more, I would buy it for you myself, but

 2   he would give them something so that they can get their shots.

 3           Right now, I have bad cholesterol, and I'm quite

 4   affected by it.  But here I am.  Here I am on account of love

 5   because I've seen the good that he's done others.  I believe,

 6   and I am convinced, as a minister of God, that he is a man

 7   that God lifted up to be able to do good to his people.  And

 8   I hope that God will act according to his mercy.

 9           THE COURT:  Any questions, Mr. Ruddy?

10           MR. RUDDY:  Briefly.

11                     CROSS-EXAMINATION

12   BY MR. RUDDY:

13   Q.   Sir, your church -- your church, Mr. Ortiz Lopez built

14   it, right?

15   A.   He gave it to us in order to buy the lot, and he also

16   gave us enough to buy some loads of rebar to start

17   construction.  I cannot hide that, because God is witness of

18   what I am telling you.

19   Q.   And you are grateful for that, right?  You are grateful

20   for that?

21   A.   Quite.

22   Q.   Okay.  You --

23   A.   And I know that God will grant my heartfelt wish that

24   he touch the hearts of the authorities.

25   Q.   And this hydroelectric plant, he built it to supply
```

```
 1  power to his finca and to his house, correct?
 2              THE INTERPRETER:  To his what?
 3              MR. RUDDY:  His finca.
 4              THE WITNESS:  Well, that I know very little of
 5  because my area is Christianity.
 6  BY MR. RUDDY:
 7  Q.    Well, you mentioned that he helped by supplying power,
 8  electricity, right?
 9  A.    Amen.
10  Q.    Were you aware that the electricity that he provided he
11  actually sold to the electric company for $20,000 a month?
12  A.    No, that I don't know anything about.
13              MR. RUDDY:  Okay.  Nothing further.
14              THE COURT:  Anything else?  All right.  Thank for
15  coming in today.
16              THE WITNESS:  Thank you, and God bless you.  Many
17  blessings.
18              MS. BARROR:  Your Honor, in our sentencing
19  memorandum we summarized but included all of the 25 letters
20  that we had received from people in Guatemala attesting to
21  the fact that he had provided monies to build a school for
22  600 people.
23              The mayor of Pipeta said he was always available
24  to assist the city whenever they asked for help.  The
25  official from the Department of Education explained that he
```

1   had provided monies for many different schools and also

2   sporting activities for the children.

3          The administrator of a hospital said that he had

4   provided medical equipment and medicine for over 8,000

5   villagers in San Marcos, San Lorenzo.

6          Your Honor, I know that the Court is aware of the

7   sentencing memorandum, but it's extensive with letters from

8   people that said he helped villagers all the time.

9   Obviously, even the hydroelectric plant, Your Honor, employed

10  many people at good paying jobs, where they were learning

11  skills.  So he was providing employment to the area.

12         I don't know if he was receiving $20,000 a month

13  for the electrical that he was providing or not, Your Honor;

14  but, regardless, an electrical plant in a very rural and

15  Indian-tribe-type area, employing jobs to those people, is

16  definitely something that does help the community.

17         Your Honor, he did so many things in terms of

18  providing ambulances.  He ran a free pharmacy where medicines

19  were donated every month to help villagers.  And then there

20  is a lot of individual people that provided letters, and we

21  actually -- we have a couple of clips on video that the

22  family provided to us.

23         THE COURT:  Let's go ahead and do that.  If we are

24  able to do that at a quicker pace, that would be great.

25         MS. BARROR:  Okay, Your Honor.  We will abbreviate

1  them.  My assistant, who is a lot more techie than I am, will

2  attempt to run through them fairly quickly.

3         THE COURT:  Because I have read everything, but I

4  don't want in any way to impinge on your opportunity to

5  present your client's case.

6         MS. BARROR:  No, of course, Your Honor.  Thank you.

7         (Video played during the proceedings.)

8         MS. BARROR:  When he was arrested, Your Honor,

9  people took to the streets because he had such a reputation

10  in Guatemala of helping the community.  Obviously we are not

11  going to bore the Court with seeing minute after minute of

12  the protest, Your Honor, but he had a lot of the rural area's

13  support.

14         THE COURT:  This is in his hometown?

15         MS. BARROR:  I don't know the answer.

16         THE COURT:  But it's from Guatemala?

17         MS. BARROR:  Yes, Your Honor, it's from Guatemala.

18  I believe they were outside the courthouse, but I'm not

19  100 percent sure.

20         THE COURT:  I see.

21         MS. BARROR:  And then, Your Honor, there are some

22  shots here of the judicial proceeding where, of course, the

23  Guatemala's attorney position is that Guatemala had not

24  followed its own law, but I know we are not here to debate

25  that.

1           If we could go through a couple of quick shots of

2    different people that have appeared to give like a

3    testimonial.  This is the pharmacy, Your Honor, where he has

4    some basic things that he provides to the villagers, just

5    very basic medical care, like blood pressure taking and that

6    sort of thing.

7           THE COURT:  These are services that you say he

8    provided to the community?

9           MS. BARROR:  Yes, Your Honor, to the community.

10          THE COURT:  Just so the record is clear, I told

11   the court reporter not to worry.  I know it's in Spanish, so

12   it can be indicated as speaking Spanish on the video.  He

13   does not need to worry about it.

14          MS. BARROR:  We can stop it here, Your Honor.  I

15   don't want to take a great deal of the Court's time.

16          We have the clinic that he had going on for five

17   years.  And I know it looks very basic; but I guess if there

18   is not a whole lot in the community, it's of some help if 20

19   or 28 people are coming daily.  Unfortunately, Your Honor,

20   the conditions in Guatemala are very bad.

21          And, Your Honor, we --

22          THE COURT:  I think I get the gist of it.

23          MS. BARROR:  Your Honor, I don't want to take a

24   lot of the Court's time.  I know the Court is very busy, but

25   we have five more videos.

```
 1              (Video played during the proceedings.)

 2              MS. BARROR:  They are all basically the same

 3    theme.  People very poor in these rural areas that he helped

 4    with taking care of their children, taking care of their

 5    parents.  And a lot of them -- the general gist is also

 6    mentioned in the sentencing memorandum.

 7              THE COURT:  Right.

 8              MS. BARROR:  Your Honor, I have two additional

 9    witnesses that are going to be very brief.  One is an

10    attorney that came from Guatemala that has known Mr. Ortiz

11    for a number of years and will attest to the fact that he

12    treated his employees well, better than the average.

13              THE COURT:  That's fine.

14              MS. BARROR:  And she will come forward, and her

15    name is Karen Ocana.

16              THE COURT:  Thank you.

17              THE COURTROOM DEPUTY:  Please raise your right

18    hand.

19              Do you solemnly swear or affirm under penalty of

20    perjury that the testimony you shall give in this cause will

21    be the truth, the whole truth, and nothing but the truth?

22              THE WITNESS:  Yes.

23              THE COURTROOM DEPUTY:  State your name for the

24    record and spell your last name.

25              THE WITNESS:  Yolanda Ocana.  Good morning to all.
```

1                      YOLANDA OCANA,

2    having been first duly sworn by the Courtroom Deputy,

3    testified as follows:

4               With all due respect, I would like to address the

5    judge of the Middle District of Florida of Tampa.

6               What I have come to say is that I have known

7    Mr. Ortiz Lopez for years.  What I would like to say is that

8    he has performed honorably in the community, offering

9    employment for many people of little resources.

10              As you know, Guatemala is a country in

11   development, so you may be able to get some degree or a

12   professional license, but there is no employment.  He has

13   been characterized with offering good employment that allows

14   people to maintain their families.  For that reason, he is

15   very much loved in our community and respected.

16              That's all.  Thank you very much.

17              THE COURT:  Thank you.

18              Anything for this witness, Mr. Ruddy?

19              MR. RUDDY:  No, Your Honor.

20              THE COURT:  Miss Barror, do you want to call your

21   next witness, please.

22              MS. BARROR:  I have another brief witness.

23   Juventino Carlos Reina Ruiz, and he did come all the way from

24   Guatemala, Your Honor, to address the Court, so his testimony

25   is going to be very brief.  He is a neighbor of Mr. Ortiz.

1        THE COURTROOM DEPUTY:  Please raise your right

2   hand.

3        Do you solemnly swear or affirm under penalty of

4   perjury that the testimony you shall give in this cause will

5   be the truth, the whole truth, and nothing but the truth?

6        THE WITNESS:  I affirm.

7        THE COURTROOM DEPUTY:  State your name for the

8   record and spell your last name.

9        THE WITNESS:  Juventino Carlos Reina Ruiz.

10        JUVENTINO CARLOS REINA RUIZ,

11   having been first duly sworn by the Courtroom Deputy,

12   testified as follows:

13                  DIRECT EXAMINATION

14   BY MS. BARROR:

15   Q.    Sir, you know the Defendant Juan Alberto Ortiz Lopez?

16   A.    Yes.

17   Q.    And how long have you known him for?

18   A.    Approximately 15 years.

19   Q.    And how is it that you know him?  Do you live close to

20   him?

21   A.    I am Mr. Ortiz's mother's neighbor.  And it was through

22   her that I had the opportunity to meet Mr. Ortiz personally

23   at one of his farms.

24   Q.    And what observation did you make with regards to

25   Mr. Ortiz's character or handling of his workers?

1   A.    Well, it just so happens that in the time that I have

2   known him, I have shared in some activities with him and his

3   people.

4   Q.    And what kind of activities were those?

5   A.    For example, the gifts that he would provide children

6   at Christmastime.

7   Q.    And did you participate in distribution of the gifts,

8   or how is it you know he did that?

9   A.    Well, I was invited to help him out.  In fact, to help

10  him distribute them.

11  Q.    And was that a one-day event?

12  A.    Well, it was one day every year during the times that I

13  had the opportunity to do this.

14  Q.    And how many years did you participate in that?

15  A.    It may have been five years, perhaps.

16  Q.    And did you have any occasion to visit the pharmacy

17  that he provided for the community?

18  A.    Well, when I am in those areas, yes.  I have seen it

19  myself.  Now, I have not participated in distributing the

20  medication or in the consultations done there, but it does

21  exist.

22  Q.    Is there anything else you would like this Court to

23  know about your dealings with Mr. Ortiz with regards to

24  community help?

25  A.    Well, yes.  I do know the things he has provided in

1  matters of health to all the community, the money that he's

2  given, medication that he's offered, transportation to take

3  people who don't have another means to these hospital

4  centers.

5  Q.    Is there anything else you would like to share, sir?

6  A.    Well, going back to the way he deals with his

7  employees, I am a conductor of several of these events in

8  which he gathers his workers together, and he gives them

9  gifts, and they have festivities so that the worker will be

10 happy and feel that they are being compensated for the work

11 that they are doing to foster his farms.

12         MS. BARROR:  Okay.  Thank you, sir.  I pass the

13 witness.

14         THE COURT:  Any questions, Mr. Ruddy?

15         MR. RUDDY:  No, Your Honor.

16         THE COURT:  Thank you.  We need to go ahead and

17 wrap up, Miss Barror.  Is there anything your client would

18 like to say?  Any closing arguments you would like to make?

19         MS. BARROR:  Very briefly, Your Honor.

20         I would make a closing argument asking the Court

21 to consider a departure to a level 34 based upon a departure

22 for the harsh conditions that he experienced in the Guatemala

23 prisons for three years, which I think amounts to about a day

24 for day maybe, give or take.  Also, Your Honor, for the Court

25 to depart for all of the good work that he has done for his

1    community.

2           The defendant would like to briefly address the

3    Court.

4           THE COURT:  Thank you, Miss Barror.

5           Mr. Ortiz, I'm happy to hear you now, sir.

6           THE DEFENDANT:  Very good day, Your Honor.

7           I've had an opportunity to share with the agent,

8    Mr. Coker.  I understand that he's devoted to his job of

9    pursuing criminals.

10          I wanted to tell you that I, perhaps, committed a

11   mistake -- I did commit a mistake working in this type of

12   work.

13          We, unfortunately, live in a country, which is

14   Guatemala, and we are like a bridge between Colombia and the

15   United States.

16          I wanted to explain to the agent that I never went

17   to Colombia to get cocaine and I never transported cocaine to

18   the United States.  My work was to remain in Guatemala, but

19   depend on the bosses who were Colombian.

20          Now, it was wrong for me to work with people like

21   those.  I acknowledge that I was making a mistake.  And it is

22   true, what Mr. Ruddy says, that I came from a very poor

23   family.  I looked for opportunities everywhere.  In fact, I

24   even came to the United States to try to work.

25          But when I was 20 years old, my father was killed

1   in Guatemala, and I looked for an opportunity to come legally

2   to the United States to work.  I had come illegally to the

3   United States.  And when I applied for a work permit in the

4   United States, I was told here that they gave me eight days

5   for me to return to my country.

6          I could not find any opportunity of how to survive

7   or to get ahead.  I know how one can work here in the

8   United States.  In fact, I worked for a year in a company

9   here in the United States.  And I've got this -- and I found

10  an opportunity, perhaps in drug trafficking, to be able to

11  work and to be able to help people in need.

12         I do not wish by this to justify what I did.  But

13  I have to tell the truth.  When Jesus Christ was crucified,

14  the Bible says he was crucified alongside two thieves.  One

15  was on his right and the other was on his left, and there was

16  a good thief and a bad thief, and that means that there are

17  two types of criminals.  There are people who work illicitly

18  and they do it to -- for self "grandizement."

19         And then there are those who work in criminal

20  activity, but it's not for self "grandizement."  It's in

21  order to give others, the poor, what they need because we

22  know what they need.  And it's painful when we hear of their

23  problems and their needs, that they have a son who is ill or

24  some member of the family.

25         I haven't had to be told about the needs of the

1   poor.  I come from a poor family, one that has struggled for

2   many years, always looking for a chance to get ahead.

3           And sometimes we don't find it.  Unfortunately, we

4   are in a country where there is drug trafficking, where drugs

5   pass through, so it's out of need and because of the problems

6   we have in Guatemala.  So we opt to commit these things.

7           We are people who have worked.  With my mother, I

8   worked here in the United States.  I came from a humble,

9   hard-working family.  And I want to at this time clear up my

10  situation and demonstrate who I really am.  I did not

11  endeavor to try to become big in drug trafficking.

12          I looked for a way of growing so that I could help

13  people who were like me who are in need.  And, at this time,

14  I would like to ask the forgiveness of the United States for

15  what I did.  I would like to ask Your Honor to take into

16  account the person that I really am.

17          I tried to be an honorable person, a Christian, an

18  evangelist.  I tried to work with people, with pastors, with

19  churches.  I've worked in the communities, helping them out

20  by building roads.  I've tried to find a way for there to be

21  opportunities in my country, because I believe that if God is

22  with us and we try to work honestly, then God will help us.

23          I believe and I trust a great deal in God.  And

24  God will help us as long as we try to be honest people.

25          THE COURT:  All right.

1           THE WITNESS:  That's all.

2           THE COURT:  Thank you very much.

3           Anything else before I pronounce sentence,

4  Mr. Ruddy?

5           MR. RUDDY:  No, Your Honor.

6           THE COURT:  Thank you, Mr. Ruddy.

7           Anything else, Miss Barror?

8           MS. BARROR:  No, Your Honor.

9           THE COURT:  All right.  Thank you.

10          The Court has asked the defendant why judgment

11  should not now be pronounced; and after hearing the

12  defendant's response, the Court has found no cause to the

13  contrary.  The parties have made statements in their behalf

14  or have waived the opportunity to do so.  The Court has

15  reviewed the presentence report and the advisory guidelines.

16          Pursuant to Title 18, United States Code, Sections

17  3551 and 3553, it is the judgment of the Court that the

18  defendant, Juan Alberto Ortiz Lopez, is hereby committed to

19  the custody of the Bureau of Prisons, to be imprisoned for a

20  term of 262 months.

21          Upon release from imprisonment, you shall serve a

22  five-year term of supervised release.  While on supervised

23  release, you shall comply with the standard conditions

24  adopted by the Court in the Middle District of Florida.  In

25  addition, you shall comply with the following special

```
 1    conditions:   If the defendant is deported, he shall not

 2    re-enter the United States without the express permission of

 3    the appropriate governmental authority.   The defendant,

 4    having been convicted of a qualifying felony, shall cooperate

 5    in the collection of DNA as directed by the probation

 6    officer.   The mandatory drug testing requirements of the

 7    Violent Crime Control Act are imposed.

 8             The Court orders the defendant to submit to random

 9    drug testing, not to exceed 104 tests per year.   The Court

10    waives imposition of a fine.

11             Are there any forfeitures that I need to --

12             MR. RUDDY:   No, Your Honor.

13             THE COURT:   -- focus on?   Thank you.

14             It is further ordered that the defendant shall pay

15    the United States a special assessment of $100, which shall

16    be due immediately.

17             After considering the Advisory Sentencing

18    Guidelines and all the factors identified in Title 18, United

19    States Code, Sections 3553(a)(1) through (7), the Court finds

20    that the sentence imposed is sufficient but not greater than

21    necessary to comply with the statutory purposes of

22    sentencing.

23             The Court has accepted the plea agreement because

24    it is satisfied that the agreement adequately reflects the

25    seriousness of the actual offense behavior and that accepting
```

1   the plea agreement will not undermine the statutory purposes

2   of sentencing.

3           Under the plea agreement, the defendant has

4   entered a guilty plea to Count One in return for the

5   dismissal of Count Two.  In accordance with the plea

6   agreement, it is ordered that Count Two of the Indictment be

7   dismissed.

8           Is that correct, Mr. Ruddy?

9           MR. RUDDY:  That is correct, Your Honor.

10          THE COURT:  All right.  Mr. Ortiz, I'll tell you

11  why I sentenced you as I did.

12          You were a leader of a sophisticated

13  Guatemalan-based transportation organization.  You were

14  involved in transporting multi-ton quantities of cocaine from

15  Colombia to Mexico via Guatemala.

16          You received multi -- your organization received

17  multi-ton cocaine shipments in Guatemala which would then be

18  transported through Mexico to the United States, so these

19  drugs eventually found their way to the United States.

20          You purchased loads of cocaine from another drug

21  trafficking organization from 2000 to 2010.  You sold the

22  cocaine shipments to other traffickers in Mexico, and this

23  cocaine would be further transported to the United States.

24          Based on the information you've given, your

25  organization transported in excess of 40 tons.  That's 36,287

1   kilograms of cocaine to the United States.  That's an

2   extraordinary, extraordinary amount of cocaine.

3         Your sentence is fair and just when one thinks of

4   that extraordinary level of cocaine that found its way to the

5   United States and the harm that cocaine caused to individuals

6   and continues to cause to individuals in the United States.

7         There is no doubt you did good things with that

8   money.  There is no doubt the church that you -- or the

9   churches that you gave the money to, benefited.  The

10  community benefited.  The individuals who didn't have medical

11  attention benefited.

12        But, Mr. Ortiz, you were using money that didn't

13  belong to you.  Those are proceeds of drug transactions.

14  Whether it's the United States or the government of

15  Guatemala, that money belongs to somebody else.  It's no

16  different than stealing money from somebody and doing good

17  deeds with that money.  The money doesn't belong to you.

18  It's not your money to do good deeds with.

19        It's money -- it's drug proceeds that the

20  government, whether it's the government of the United States

21  or the government of Guatemala, is entitled to forfeit.  And

22  let the government do good deeds with the money.  Let them

23  use it for drug education or drug treatment or building

24  schools or building hospitals.  It's not up to you to make

25  those decisions, because that money did not belong to you,

1  sir.

2        While, on the one hand, I commend the good deeds

3  that you did -- on the other hand, I know what the law says

4  about illegal drug transactions and the fact that it is

5  really not your money.  So, quite frankly, while I think it's

6  very good that you did these good deeds with the money, it

7  doesn't result in a reduction of your sentence, because it

8  was never your money to begin with.

9        So I have not reduced your sentence.  I have not

10  departed downward.  I have not varied downward because I

11  don't think that it merits a downward departure.  As a matter

12  of fact, it's not uncommon to have individuals who have been

13  pretty high-level drug organizers do a lot of good deeds in

14  their community, but it doesn't merit a reduction in the

15  sentence.

16        So I think that I have -- to the extent I've

17  exercised restraint, it's that I didn't sentence you to the

18  middle of the guidelines or the high end of the guidelines,

19  which would have been appropriate given the high-level drug

20  organizer that you were.  Rather, if I gave you a recognition

21  for the good deeds that you've done, it's to have sentenced

22  you at the low end of the guidelines.

23        Indeed, you can cooperate with the government and

24  you can receive a Rule 35.  You can agree not to contest the

25  forfeiture of assets, whether it's the government of

```
1   Guatemala or the government of the United States.  That's how

2   you cooperate with the government, and that's how you get an

3   additional reduction in your sentence.  But as we sit here

4   today, two levels is appropriate.  The sentence that I have

5   imposed is fair and appropriate.  And as I said, it's at the

6   bottom of the guideline range.

7           The Court having pronounced sentence, does counsel

8   for the defendant or government have any objections to the

9   sentence or to the manner in which the Court pronounced

10  sentence other than those previously stated for the record?

11          Mr. Ruddy?

12          MR. RUDDY:  No, Your Honor.

13          THE COURT:  Thank you.

14          Miss Barror?

15          MS. BARROR:  Your Honor, we would object as to the

16  reasonableness of the sentence.

17          THE COURT:  Thank you.  That's fine.  Your

18  objection is noted for the record.

19          The defendant is remanded to the custody of the

20  United States Marshal to await designation by the Bureau of

21  Prisons.

22          Where would your client like to be housed?

23          MS. BARROR:  Your Honor, he would like very much

24  to be housed in Coleman.  I don't know if the Court would get

25  involved in this aspect, but he also would like to be able to
```

1    stay in this area 90 days so that he can complete what he has

2    been working on.

3              THE COURT:  Any objection to that, Mr. Ruddy?

4              MR. RUDDY:  No, Your Honor.

5              THE COURT:  All right.  I recommend to the Bureau

6    of Prisons that he be housed in Coleman.  I also direct the

7    marshal service to keep him in the Tampa area, whether it's

8    Hernando County or Clearwater, wherever he's being housed, so

9    that he can continue working on the matters that he's been

10   working on.

11             Anything else that you would like me to recommend

12   to the Bureau of Prisons, Miss Barror?

13             MS. BARROR:  No, Your Honor.  I think they will

14   have the record of his medical history, so I think they will

15   provide medical evaluation.

16             THE COURT:  And I ask that you continue to work

17   with him on that.  I want him to get the medical attention he

18   needs.  I know that was a very serious situation a few months

19   ago.

20             MS. BARROR:  Yes, Your Honor.

21             THE COURT:  Please continue to work with him.

22             And, Mr. Ortiz, if for some reason you don't get

23   the medical care you need, you can let me know directly and I

24   will get involved.  But, generally speaking, the Bureau of

25   Prisons does a very good job in taking care of prisoners'

1  health concerns, so I have no reason to believe that anything

2  different would happen in this case.

3          To the extent permitted by your plea agreement,

4  you have the right of appeal from the judgment and sentence

5  within 14 days from this date.  Failure to appeal within the

6  14-day period shall be a waiver of your right to appeal.  The

7  government may file an appeal from the sentence.

8          You are also advised that you are entitled to

9  assistance of counsel in taking on appeal; and, if you are

10  unable to afford a lawyer, one will be provided for you.  If

11  you are unable to afford the filing fee, the Clerk of the

12  Court will be directed to accept the Notice of Appeal without

13  such fee.

14          Anything else before we adjourn, Mr. Ruddy, or the

15  case agent?

16          MR. RUDDY:  No, Your Honor.

17          THE COURT:  Anything from probation, Miss Gornbein?

18          THE PROBATION OFFICER:  No, Your Honor.

19          THE COURT:  Okay.  Miss Barror, anything from over

20  here?

21          MS. BARROR:  No, Your Honor.

22          THE COURT:  Thank you, Miss Barror.  I thought you

23  put together an excellent package and presented a very good

24  presentation here to the Court, and I appreciate it.

25          Likewise, Mr. Thomas, and, Mr. Entin, I also

1   thought that your arguments were very well made, and it was a

2   very good presentation.  So I appreciate all the effort that

3   all of you put forth on behalf of your client.

4            All right.  Thank you.  And we are in recess.

5            (Proceedings concluded at 11:56 a.m.)

6                            - - -

UNITED STATES DISTRICT COURT   )
                               )
MIDDLE DISTRICT OF FLORIDA     )


**C E R T I F I C A T E**

    I, Scott N. Gamertsfelder, Official Court Reporter for

the United States District Court, Middle District of Florida,

do hereby certify that pursuant to Section 753, Title 28,

United States Code that the foregoing is a true and correct

transcript from the stenographic notes taken in the

above-entitled matter by the undersigned and that the

transcript page format is in conformance with the regulations

of the Judicial Conference of the United States.


/S/Scott Gamertsfelder, RMR, FCRR
Official Court Reporter          Date: February 8, 2017

                          - - -